All right, sorry, gentlemen, we are late. We've had two long cases with cross appeals, and now we're down to a regular. So, Mr. Lawlezern, if I get the name correctly. My name is Lawrence Lawlezern. I'm an attorney with the law firm of Lawlezern and Smith in Waukegan, and I'm here on behalf of the appellant, the City of Lake Forest. On September 20th of 2023, Officer Philip Czarnecki from the Lake Forest Police Department stopped the defendant in this case for not having a rear registration light on his vehicle. The officer approached on the driver's side of the vehicle along Green Bay Road in Lake Forest and spoke to the defendant through the passenger side window. I request that the driver's license and insurance was handed, a state identification card and insurance, and the officer had a brief conversation with the defendant as for the reason for the traffic stop. There seems to be almost a use of either driver's license or identification. Did he have a driver's license? They seem to be interwoven, and there's really sometimes one is used for the other. Did he have a driver's license? Because there's no driving without a license offense here, is there? No, he was not ticketed for not driving or driving without a license. I think he physically handed a state identification card to the officer along with the insurance card. Which is not a driver's license. It's not a driver's license. Okay. But I think with that information, the officer was going to return to a squad car, run it through his computer to determine whether or not what the status of the defendant's driving privileges were. And I believe based on the fact that there was no tickets issued for that, that he did in fact have a valid license. Okay. Officer Charneski testified that after he returned to a squad car, he prepared a written warning ticket that he was going to give to the defendant. And he re-approached the defendant's vehicle on the driver's side. And as he was speaking to the defendant, he had the written warning ticket and he had the defendant's driver's identification card and the insurance card in his hand. And he then inquired of the defendant if he knew why he was being stopped. The court heard and saw the squad video, excuse me, the body worn camera from Officer Charneski. And it was clear right before the officer returned to a squad car that the defendant started inquiring why he was being stopped because he wasn't going faster than other drivers on the roadway. But there was somewhat of a language barrier, wasn't there, Mr. Louser? The trial court found that there was. And from watching the video, it did appear that English is not the defendant's first language. Right. And so did he not understand the reason to do the language barrier for some other reason? It's not clear, at least in the officer's mind. When he re-approached, he wanted to clarify as to the defendant's knowledge of why he was being stopped. And he then inquired of him. He said, do you know why you're being stopped? And in our reply brief, I went through in very detailed, since it was not a transcript made of the body worn camera. But at 5.20 on the video, the officer re-approached and said, do you understand why you were being stopped? He said, yes, I do. He says, I understand that. And then he says, the defendant indicated, but somebody was going faster than me. They were going in front of me in more speed. And the officer said, well, no, that wasn't the reason I stopped you. I stopped you because of the license plate. And then during this conversation, the officer testified as clear on the video. And about a minute later, he says, have you been drinking tonight? And in the testimony at the trial court, the defendant or the officer testified that not only did he smell the smell of alcohol coming from the defendant's breath, but he smelled what he believed was jalapeno peppers as well. And he noticed that he was chewing on something. And so he wanted to know if, in fact, he'd been drinking at that time. And then he made a further inquiry. And the defendant admitted to consuming a couple of beers in the city of Highwood only with some friends. That led to the defendant eventually being asked to stop, step out of the vehicle and perform field sobriety tests. The trial court held that the initial stop was proper, but found that the conversation that Officer Jarneski had with the defendant upon returning with the warning ticket and his paperwork unreasonably prolonged the traffic stop. And wouldn't the officer also testify at some point that he thought the speech was a bit slurred or difficult to understand? But yet the trial judge said, you know, I didn't I didn't necessarily think it was difficult to understand. Yes. The officer did indicate he thought it was slurred, although he did acknowledge an accent that the defendant had. The trial court, I think, found in her ruling that there was cheaply the speech was slurred. But those were two observations the officer made at that time. Mr. Welleser, how did this not extend the time of the initial stop? Well, the argument that the defendant made at the trial level said was that really all the defendant or the officer was allowed to do was simply hand him his paperwork back, give him his warning ticket and go on his way. Correct. I cited to the case of People v. Adams 225 L.A. 3815 and People v. Partimo 345 L.A. 1100 in which officers approached vehicles they had stopped for basically what turned out to be an incorrect reason. In both cases, they were they couldn't find valid registration on the vehicle. And in the Adams case, this is back in the days when we would have, instead of having temporary plates on our vehicles, we would have a license applied for, stick them in the back window, and the officer testified as he got out of his car and he walked up to the car, he saw a valid license applied for. He then spoke to the defendant, explained why he stopped him. And the appellate court there said, well, that was entirely reasonable for the officer, even though there was no basis for a traffic violation or a further detention of him at that point, to approach, speak to him, and explain why he was being stopped. But then once they have that conversation and the officer makes further observations, as Officer Chaneski did in this case, in which he smelled the alcohol, noticed the slurred speech, he was, I think, entitled to and obligated to inquire further as to what was going on here. And I don't think it was reasonable for the officer to just simply hand the defendant a warning, take a step back and walk away. Why not? Why didn't he just hand it to him and say, have a nice day, sir? Well, he could have. And I know he could have. The question is, when he decides not to do that, does that necessarily prolong the stop? I don't believe that it does. Why not? Because I don't think we're talking about reasonableness of the officer's actions. He's handing him some paperwork or handing him his warning. Well, he didn't hand it to him. Well, he was in the process of that. And he said that was his kind of his... His policy. His policy, protocol, that he would approach, speak, explain why, you know, call the bedside man, what you will. Most officers will do that, whether issuing a ticket, whether they're doing a warning ticket, or whether they're just giving a verbal warning. There's a little conversation about what's happening now, because you've obviously been stopped by a police officer. And I think the motorist is anticipating some explanation of what's going to happen. Am I getting a ticket? Am I going to get arrested? Am I... It doesn't, with all respect, what you think an average motorist would want is not relevant, nor in this record. The question is, does, when he initiates a conversation, does that prolong the stop? He could have just, here you go, sir, have a nice day. How do we determine how much conversation is still part of the purpose of the stop? Well, going back to the Bartimo case, where the court in that case said the officer was not required to drive away and leave the defendant wondering why he was being pulled over. I think the extension of that argument or that logic is that the officer can briefly explain why he's doing what he's going to do, or what action is going to be taken there. So, was it reasonable? And I guess what the issue is, at what point does it unreasonably prolong that traffic stop? And for the officer to say, do you understand why I'm being stopped? And here's what I'm going to do. I'm going to give you a written warning ticket. I don't think at that point he has unreasonably prolonged it, because once he's now approached on the driver's side, and much closer proximity to the driver than from the initial approach on the passenger's side, he's in a position where he smelled alcohol coming from the defendant's breath, and he smelled the jalapeno peppers there. So once he makes that observation or that makes, observes that or notes that, I think he then can proceed further with an investigation, an inquiry beyond that. Does he have an obligation to proceed further at that point? Well, I started the two cases in the, in my brief, the Village of Plainfield v. Anderson at 304 L.F. 3rd, 709, and Village of Lincolnshire v. Kelly, 389 L.F. 3rd, 881, in which the appellate question in both cases said, an officer faced with those facts and circumstances, particularly a smell of alcohol, would be so intolerant in their duties if they don't inquire further. And then in the McDonough case, the Supreme Court noted, as soon as the officer, the defendant rolled down the window and the officer smelled the alcohol, then the whole kind of traffic step changes and the investigation changes. And it's not just a duty and obligation, but I think for both the Anderson case and the Kelly case, they, you know, the officer would be derelict in his duty if he simply let this driver drive away, having some indication that the defendant may have consumed alcohol, and ask him to, and then compound that with the fact the defendant, in fact, admitted to drinking alcohol in the city of Iwood, which is just south of the city of Lake Forest. He said he was drinking with some friends. I think it's entirely reasonable at that point for the officer then to not only inquire further, but to ask the defendant to step out of the vehicle and perform field sobriety tests. You know, the whole touchstone of the Fourth Amendment is this reasonableness. I think the officer's actions in this case were entirely reasonable. And the fact that he didn't smell on the initial approach on the passenger side, which I think everybody can, everybody understood was proper, and I don't think it's illogical that he wouldn't have been able to smell the alcohol there, now he's on the driver's side, much closer proximity, not only does he have that new observation to extend this traffic stop, but he's then faced with a situation where I think he's got an obligation as a public safety officer to make that. And then, again, going back to the actual conversation from when, essentially from when the officer first re-approaches, so he asks about, it's within a minute, and that whole conversation about that takes less than two minutes. I don't think that unreasonably prolonged that traffic stop in conjunction with everything else here. And I think the trial court just incorrectly ruled that the stop was improbably prolonged. Does the officer have an obligation to, with an equipment violation, to explain to the driver that this is not a free pass, you have to get this fixed? Your car does not comply, whether it's a tire, a light, inoperable, turn signal, whatever it would be. Well, the officers, as the courts have, you know, given the officer a lot of latitude, not only the inquiries as to the status of the driver's license, insurance, equipment, warrants, and so forth like that. I think they do have an obligation to, at a minimum, say, here's why I'm stopping you. Now, the officer had many options in this case. He could have given him a ticket. He could have given him a warning. He could have given him verbal warning. But I think he does have, I guess, maybe for public policy or just good public relations, if you will, to identify that you have a problem with your vehicle, you might get stopped, you know, tomorrow or later tonight if you don't get this fixed, you know, in the next day or so here. So I think there is some sort of an obligation. And I think the officers took it upon them, you know, to see that that was, you know, an appropriate response to that. Does Lake Forest, excuse me, have any sort of handbook or protocol for your police officers to do certain things during a traffic stop? Well, I think they have general orders that kind of give them what their discretion is. And certainly, it would be based on the seriousness of the potential offense. So was that introduced in this matter? It was not. The officer was not inquired of it. There was no evidence produced as to the general order. It was basically in his discretion as to what actions, you know, he thought were appropriate. Because that, I think that relates to Justice Ferguson's question that, you know, should he, should the police officer, whoever that might be, say, you know, this is a violation. I'm just giving you a warning. But if you don't get it fixed, you could have a problem, a real problem. And so there's, you know, nothing was in the record that indicated that that was part of a Lake Forest policy or protocol. Nothing in the record was of that. You know, I have, in my experience over the years, I've run into officers in traffic court where, you know, they appear to be issuing somebody a ticket for a minor violation. And in further inquiry, they find, you know, they had stopped that person a couple of weeks ago for the same thing, gave them the verbal warning, and advised them, as Justice Ferguson did, to get that item fixed, to repair that tail light or the brake light, whatever it may be. And since they didn't do it then, now they're getting a ticket on that. So, you know, they do have that discretion. I think the officer was within his discretion to issue the written warning ticket that he did. And for all the reasons that we've set forth in our brief, we would ask the Court to, you know, reverse the trial court's decision, finding that this was an unreasonable stop, then reverse that and deny the warning. Justice Shostak. Nothing further. Thank you. Thank you very much, Your Honor. All right. Mr. Cohn. Thank you. May it please the Court, may it be a good afternoon. It is. My name is Lyle Cohn. I represent the appellee, Ray Martinez. On occasion, I do refer to him as Ray Martinez. I don't want to spend a lot of time on the facts of the case, but I feel obligated to spend some time, because this is a Fourth Amendment issue. And we all know that these Fourth Amendment issues are extremely driven by the facts. Well, if you could, in whatever you want to tell us, indicate why he got out of the car. I mean, that's one of the issues that was interesting to me, why he got out of the car when everything else was taking place in the car. My recollection and my understanding is that he got out of the car after the officer approached with the intent to issue a warning ticket and nothing else. The officer engaged my client in a conversation. He didn't make an observation of my client. He engaged my client in conversation by saying, I just want to make sure you understand why I stopped you. I just want to make sure you understand why I stopped you. And there was evidence in the record that he did it gratuitously, because that was his policy. Your Honor, to directly address your question, my client got out of the car after acknowledging he understood, and walked back to the car and looked and bent over and saw the light, which was supposed to illuminate the license plate. He saw the light was not working, and he either nodded or made some gesture, maybe even verbal, wherein he understood. That's the exact answer why he got out of the car, because he understood what the police officer was telling him. And that came as a result of the police officer taking, well, not very long, because we've got 945 stops and 9, I think, 57 just wondering about the odor. So we're talking about not a whole lot of time here. No. He walked to the back of the car, you think, to look at the light. I think he did. And there was no evidence developed that my client had any problem exiting the vehicle or walking to the rear of the vehicle. There was a significant amount of evidence developed prior or about incidents that occurred prior to the officer deciding he was going to issue the warning. He observed my client for a reasonable period of time, operating a reasonable distance. There was nothing about the manner in which the vehicle was driven, curbed, or parked that aroused the officer's suspicions. There was questions and answers wherein the officer said, nothing that I observed led me to believe his mental ability to operate safely was impaired. The officer indicated he did not observe anything that led him to believe my client's physical ability to safely operate was affected on the evening in question. Counsel cites the Anderson and the Kelly cases. In both of those cases, officers made observations of drivers at the time of the initial encounter, but did not act on those observations until later. And I believe that was appropriate. In each of those two cases, officers observed odors, eyes, slurred speech, admissions to consumption. And I believe in the Kelly case, it was a female driver who said, I was coming from Vernon Hills in a restaurant and I'm going to Graves Lake. No, no, I'm going to Graves Lake. I'm coming from Vernon Hills. The officers in those cases did not act on that evidence. In my case, in our case, the officer clearly testified that nothing, nothing about the manner in which the vehicle was driven or the manner in which my client conducted himself rang a bell, set off an alarm in the officer where I need to pursue this further. Yeah, but it did. It did set off an alarm when it came around to the driver's side, correct? When he was on the passenger side, there was no alarm set off because he was a distance. He then came around to the driver's side to hand him the warning, and that's when he smelled the alcohol. After he prolonged the nature of the stop by asking my client repeatedly, do you understand why I stopped you? The officer clearly intended to issue the warning citation. The computer, for lack of better wording, the computer and the printer in the squad car printed out the warning. The officer intended to re-approach, give my client his ID card and his insurance back, and to tender the warning. The tendering of the warning would speak for itself as to why the officer was stopping my client. In addition, the trial court found- Counsel, that nuance there. Yes, your light is out, but the additional part. Sir, you have to get this fixed. This is not like a speeding ticket where, okay, the complete act is done, all you have to do is go to court, plead not guilty, blah, blah, blah, whatever. Here, it's like your light is out, your vehicle remains in non-compliance. Why isn't that a portion of the purpose of the traffic stop? Because that information, given to my client verbally, is unfortunately not going to be understandable. Why not? Because English is not his first language. But he knew that he got out of the car to examine it. Right. Right? Right. So, is it the officer's fault that your client doesn't understand yet? No. So then, if he's trying to explain it, are we creating a new rule that says, well, if the driver doesn't understand English, that's it, give him the ticket and walk away? No, no. But I'm going to go back to, and I hope this answers, I think that the warning citation speaks for itself. If it did not, had the officer not intended to issue the warning citation, I think, your honor, your point is very well taken. You stop the defendant, you don't give a citation or a warning, and you tell him he can go. Now he's very confused, and we're not achieving the result of getting the vehicle in compliance. Had he not intended to give that, I think we would have had a different situation. But at the risk of repeating myself, the warning, the written warning is going to speak for itself. But does the warning say, and you must repair this, or you must bring your vehicle into compliance? Because I think that's the crux of what this police officer's doing, is, sir, do you understand, I'm stopping you because the light's out, you have to fix the light, or you have to get it, whatever. Your honor, I'm not sure if the warning, I don't believe it would be that specific. It's not on there, it doesn't, isn't that kind of a public service to say, hey, you know, you have to get this fixed, otherwise your vehicle remains in noncompliance. Listen, I think, I think there is always that balance. There is always that balance. You know, the warning is for a petty offense, where it, and it. The ticket would have been a petty. The ticket would have mandated, at a minimum, with a zero fine, costs, and fees. The warning imposes zero financial consideration on my client. The nature in which this matter was played out resulted in my client being handcuffed, arrested, fingerprinted, and mug shot for a class A misdemeanor. Well, isn't the odor of alcohol reasonable suspicion? The odor of alcohol is only gleaned after my client is unduly detained, one. And number two, drinking- Why was he unduly detained? I mean, he- I, I, can I finish, I'll finish my one point if you don't mind, thank you. And two, two, it is not illegal to consume in Illinois. It's illegal to consume and operate where your ability to safely operate is affected. Now, I think it's a wonderful question. Armed with the information, hypothetically, that he spelled an odor of alcohol, and he observed my client weave, or take an excessive period of time to stop, or he, or my client was wrong way on a runway, or had ran a red light. That information, the odor armed with additional information, could effectively lead to where I believe your court, the court's going. But the officer was crystal clear that nothing about my client's mannerisms or anything. So- But, but when he comes back and the defendant is eating a jalapeno pepper that is on the back seat, I mean, could that give him reasonable suspicion that the defendant is trying to cover something up? I mean, I'm just playing dead with that. I understand the question. But I mean, even if, even if, for sake of argument, this court would reverse the judgment of the trial court with respect to the motion that you made. You still go back to the point where you have a trial and you argue there was no reasonable suspicion, correct? That would be one of the arguments. There was no other indication of any impairment. Whatever argument you would make, if we would reverse the trial court's ruling on the motion to quash and suppress, you still get a trial. Yes, yes, yes. Okay, that's what my question is. Yes. The police officer unduly prolonged the stop by asking a series of questions. He had made up his mind that he was going to issue the written warning. His interest, his curiosity was not piqued about anything else. He said it was my intention to re-approach and hand him the paperwork. Okay, so let's take these two things separately. You're saying he prolonged the stop because he should have just walked up, handed him the ticket, and turned around and left. Right, because when he doesn't hand him the tickets, in conjunction with holding back the license and the ID card, my client has no choice but to stay there. Okay, now let's go to the next step. Then he smells what he believes to be alcohol. Your position is he needed something more in conjunction with that smell of alcohol to create- Judge, that is my position because there was a significant amount of testimony adduced that there was nothing else that led- No bad driving, no slurred speech, no swaying, nothing to that effect. No, and nor did he buy out of time to curb the vehicle, didn't run the vehicle into the curb when he stopped it, parked it correctly. Okay. No question, again, it's on the DUI, it's a totality of the circumstances. There's no question that would be- So part one is the stop, part two is the DUI. I didn't contest, and I still don't contest today, that the stop, the initial stop for the failure to illuminate, I don't contest that. It was a legitimate stop, the vehicle code requires the illumination. Any violation of the vehicle code would be a reasonable basis to stop the vehicle. I did not contest it, and I- You're contesting the prolonged stop. Exactly, Your Honor, very narrow issue. So if you get stopped for not having full speed, and a police officer comes up and says, can I have your driver's license? And you say, I don't have my driver's license, I left it at home. And he goes back, writes you a ticket, or writes you a warning. No, a ticket on the driver's license. Comes back and says, I'm writing you a ticket on the driver's license, but if you take it to the clerk's office and present your driver's license, they'll dismiss this charge. That's true, that's by statute. Are they prolonging the stop in explaining that to you? They are, because I don't think the police officer has any obligation, nor should he be giving any legal advice. Okay. I don't expect law enforcement to give legal advice, nor would I want them to. That's not legal advice as much as it is a public service to your community, right? I mean, so you're going to have a police officer walk up, hand a ticket, turn around and walk away. Do you think the chief is going to get some phone calls later on about how abrupt and how unpleasant these police officers, especially in the late 40s? Your Honor, with all due respect, I live in the next town over. I think in many of these communities, whatever happens, there will be feedback and pushback. We all are mature adults, and we all see what happens. Yeah, yeah, so you see where I am going with prolonging a stop. I understand. However, it's a constitutional issue. It's a Fourth Amendment issue. Even in Lake Forest. So to answer my question, you keep saying that odor alone is not enough. There has to be something else. The bad driving, bad curbing, whatever. What about odor and apparent confusion? Now, I know you've suggested, and I'll give you an opportunity to respond, but here's my point. We now, in retrospect, know language was an issue. But do we charge the officer with knowing that or assuming that when he's receiving information that leads him to believe, I have a very confused driver, plus odor of alcohol? Again, that becomes indicia of intoxication. And I want to make sure I understand, Your Honor. Odor plus confusion would rise to a more significant reason or- A reasonable suspicion. Okay. For at least, you know, a couple more questions, a little bit more investigation. The trial court found there was a severe language barrier. Wait, but when? When is that apparent to the police officer as opposed to confusion? Well, I will tell you this- Because we do have, and you're cutting me off, I apologize. No, but here's my point. Again, it's in the eyes of the officer at the time it's happening. Not in retrospect going, oh, gee, you know, there's a terrible language barrier here. Therefore, that negates the officer's reliance on apparent confusion. Here's where I think confusion is more of an indicator than it was here. One, there were findings that the confusion was a result of a language barrier. Two, we have seen situations in the past where the odor of alcohol in conjunction with the manner in which the defendant acted led me to believe he was confused. I asked for a driver's license, and he handed me his lunchbox from work. He handed an ID. He handed an ID, which is very similar in style to an Illinois driver's license. A little bit of confusion. I mean, because we know that the defendant had a valid license because he ran it and he had one. But he didn't give it to him. I mean, all these little factors, don't this, doesn't this lead up to confusion? And are those two factors enough? Those two factors are not enough in our case, and I'll tell you why. Because the officer never opined, never testified, never put in any report, never indicated. The odor plus the confusion plus the fact that he gave me an ID instead of a driver's license led me to believe. But the peppers, he did mention the peppers. After he unduly prolonged the nature of the stop by repeatedly asking my client whether or not he understood the basis. But you're in the second part now. You're in the DUI. We're not really here for the DUI at this point. We're only here for the alleged prolonged time of the arrest. That's all we have to speak to. Agreed. Again, my question to you is, should this go back, do you address your DUI at that point? Yes, at that point, you address your DUI. At this point, you address, was the traffic stop prolonged? That's all we're looking at. I agree.  And I think it was. And the fact, well, the fact that an intervening suspicion, reasonable suspicion cropped up doesn't, I mean, we're not now dealing with the same traffic stop. We're dealing with a different traffic stop, even though it is the same party, same car, same officer. It's different than the registration light or the license light. The encounter was fundamentally changed. It went from an inquiry about a penny offense to an inquiry about a criminal act, a potentially criminal act. Well, it is technically a criminal act all the time because he's being stopped. He's getting a warning, and that's discretion of the officer. But it's a, now it's, as I said, same officer, same location, same car, same person driving the car. But we have a different now indication or some different issue, so there's an intervening cause. And we know that intervening causes are not necessarily part of that stop. He learned something upon talking. Maybe he learned the minute he stepped at the window and handed him the ticket. It's not real precise here in terms of this record, but we do know they had a short conversation, which led to your client getting out of the car and checking. We don't know the timeline on that, when that happened. That's not really clear. But if we have something else that happens, we're not still dealing with the stop for the license plate light, are we? Well, your point's well taken. It is one stop. I'm going to go back to the fact that the prolonging led to the officer's ability to discover. Well, did the calling of a Spanish-speaking officer who apparently was on staff, did that prolong this? Wouldn't that have been a help to your client if there was somebody there who could help your client understand what was really going on? Would that have been helpful? Yes. Oh, sure. And so they did that. This Polish officer called the Spanish-speaking officer. After the fact. Well, I'm not sure. Again, I'm not sure exactly when that happened, if it happened after he ran the license, because the timeline just reflects to at least the timeline I looked at. We have a stop, we have running of the materials, and then we have coming back. And we've got 13 minutes. That's not a very long time for even the idea of he knew something else happened someplace between 12, 11, and 13 minutes into this whole traffic procedure. I mean, it's not that long a time. It goes by quickly, as a matter of fact. The older you get. The issue of the warning, the issuance of the warning citation did not take that long in the absence of other indicators. Well, today it actually runs off of a computer. I get that. That should make it go faster, rather than writing it out. But the fact remains, he still has to go through leads, he still has to go through to find out if there's an active warrant, and that even went pretty fast in this case. I mean, when they didn't have electronic equipment like they have now, it took a longer, much longer time. But it's today, and Lake Forest has better equipment maybe than McHenry County has. I don't have anything further unless Your Honors. Justice Jorgensen. No, thank you, Counsel. You've been kind enough answering all these picky questions and me interrupting you. But that's what it's all about. Thank you. Thank you very much. If you mention my age one more time, you're dead. Ms. Glasser. Did I do it before? Did I do it before? I'd just like to briefly address the confusion issue that was raised by some of the questions that the Justices asked. I think when you go back and look at the initial approach when the defendant is asked about the light, and he makes the comment that other people were going faster than him, I think that's what generated the follow-up questions from Officer Sharneski when he approached with the warning ticket, asking if he really understood why he was being stopped since he referenced speeding when he first spoke to him. And that conversation is when the smell of the alcohol, it's when the smell of the jalapenos, and that's when the focus seemed to switch.  That's the second approach. The second approach. Right. Right. When he's now on the driver's side there, he smells the alcohol, he smells the jalapeno. And as Justice pointed out there, it was a little unusual because when he has this conversation about the jalapenos, the officer is, in fact, asking him, are you chewing that to cover up the smell of the alcohol? And the officer, and the defendant says, no, they're too hot. And he's still in the car, but it was clear he had some leaf of some type in his mouth there, and I think he testified, the officer testified that the defendant's tongue was green. And at that point, the defendant actually gets out of the vehicle. He wasn't asked to get out of the vehicle, but then he gets out of the car. He opens the back door of his vehicle, and you could see there was some grocery bags. It looked like they had some vegetables of some sort in there. And that's when the officer kind of refocuses him and says, no, no, we're talking about the light, and then he's already talked about the smell of the alcohol. But I think what McDonough says is once you get that smell of alcohol, it really creates an obligation on the officer to inquire further. Is it a matter of questions, which is what the officer did in this case. Have you been drinking? There's an admission to drinking. Where were you drinking? When were you drinking? And then at some point, in fact, the officer did request Officer Czernikowicz, who was a Spanish-speaking officer, to show up on the scene there because he did realize that there was some potential language barriers there with the defendant there. But at each step of that inquiry about whether he was drinking and how much he had to drink, the defendant made the comment, he goes, I was drinking, but I wasn't crazy like that. I think the officer's been obligated, because the Anderson case and the Kelly case say the officer's been obligated to go further and ask him to do field sobriety tests. But in Anderson and Kelly, as Mr. Cohen said, there was the – that was the initial stop when they initially stepped up. He didn't go back to the car and then come back in those cases, did he? Well, it was detected upon the initial approach there, but the smell was there. I guess it really wouldn't be any different than if the officer would come across the vehicle, stopped on the side of the road or in a parking lot or on the side of the street, perhaps looking for a motorist assist, but then when he talks to the driver, smells the alcohol. Now, at that point, he's observed no bad driving and the officer's observed no bad driving. There's a smell of alcohol. And then the inquiry further, you know, why are you here? Are you having a medical issue? Do you have a mechanical problem? You know, I smell alcohol. Have you been drinking? Where have you been drinking? How much have you had to drink? And I think at that point – That's in a caretaking capacity, isn't it? Potentially, yes. But then when you get the smell of the alcohol, I think then I think the obligation shifts. Because if the officer just simply walks away at that point without any action of anything like that, that driver could start up the car and drive away. And so if it's not a medical emergency and it's not a mechanical problem and the inquiry is about the smell of alcohol and consumption of alcohol, if there's admissions, I don't think it's an unreasonable request of the officer to ask the defendant to do a field sobriety test to confirm those suspicions and make further inquiry at that point. So, you know, I think everything Officer Czarneski did at this point was appropriate, it was reasonable, whether it was good public relations or, you know, caretaking or whatever you want to call it, to advise the defendant that he has an ongoing problem. The light is still out. It's going to be out 10 minutes from now, and it's going to be out most likely until you get it fixed, whether it's a bomb, whether it's a wiring issue. And it's not just a matter of, you know, the violation has been resolved here, a speeding ticket, a traffic light, whatever it is. And now the defendant is free to go on. There's a continuing violation here. So I think when we look at the touchstone being the reasonableness under the Fourth Amendment, I think the officer's actions were entirely reasonable in the way he approached the initial stop and the subsequent stop and asking the court to reverse the trial court. All right. Thank you, counsel. We will take this matter under advisement, and we will issue a decision in due course.